SEALED *per Minutes on 8-22-2008*

**FILED**

AUG 1 3 2008

CLERK, U.S. DISTRICT COURT
SOUTHERN DISTRICT OF CALIFORNIA
BY_____ DEPUTY

KAREN P. HEWITT
United States Attorney
CALEB E. MASON
Assistant United States Attorney
California Bar No. 246653
Federal Office Building
880 Front Street, Room 6293
San Diego, California  92101-8893
Telephone: (619) 557-5956/(619)235-4716(Fax)
Email: caleb.mason@usdoj.gov

Attorneys for Plaintiff
United States of America

### UNITED STATES DISTRICT COURT

### SOUTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| UNITED STATES OF AMERICA, )<br><br>                    Plaintiff, )<br><br>          v. )<br><br>FRANCISCO ESPARZA-GUTIERREZ, )<br><br>                    Defendant. )<br>_____ ) | Criminal Case No.  08CR0416LAB<br><br>**FILED UNDER SEAL**<br><br>Response   in   Opposition   to<br>Defendant's   Motion   to   Compel<br>Specific Performance and to Dismiss<br>the Indictment<br><br>Date:          August 18, 2008<br>Time:          3 p.m.<br>Honorable:   Larry A. Burns<br>Courtroom: |

The UNITED STATES OF AMERICA, by and through its counsel, KAREN P. HEWITT, United States Attorney, CALEB E. MASON, Assistant United States Attorney, hereby files the following Response in Opposition to Defendant's Motion to Compel Specific Performance and to Dismiss the Indictment.

### Facts and Procedural History

On January 21, 2008, at 9 p.m., defendant Francisco Esparza-Gutierrez ("Defendant") was found by the Border Patrol, hiding in the bushes one mile north of the U.S.-Mexico border and ten miles east of the Tecate, CA, port of entry.  Records checks revealed that Defendant

1  had been deported from the United States to Mexico on August 20, 2007,

2  and that between August 2007 and January 2008 he had been apprehended

3  approximately 30 times, and each time was voluntarily returned to

4  Mexico.

5      As part of a "fast track" early disposition program, Esparza

6  negotiated a plea agreement with the government. The plea agreement

7  was filed on February 26, 2008. The parties signed a plea agreement

8  that provided, inter alia, that USSG § 2L1.2 applied, and that the

9  offense should carry a base offense level of 8 and a two-level

10 downward adjustment for acceptance of responsibility, for a total

11 offense level of 6. The agreement provided that the parties would not

12 recommend any upward or downward adjustments or departures, and that

13 the parties had no agreement as to the defendant's criminal history.

14 The agreement provided that:

15      in the event contrary or additional information is
        discovered concerning defendant's criminal history which
16      changes defendant's CHC before defendant is sentenced,
        then (a) the Court may sentence the defendant based upon
17      the agreed total offense level of 6 at the new CHC; or (b)
        the Government may withdraw from the plea agreement or
18      move to set aside the guilty plea or both.

19

20      The agreement provided that the parties would jointly recommend

    60 days' imprisonment.

21

22      The government filed its Sentencing Summary Chart on February 28,

23 2008. That chart included a "rap sheet" summary of the defendant's

    criminal history then known to the government. The chart showed no

24 criminal history.

25      On March 11, 2008, the Probation Department filed a criminal

26 history report which noted a conviction on November 13, 2007, for

27 reentry following deportation in violation of 8 U.S.C. § 1326.

28      On March 24, 2008, the government filed an amended Sentencing

08cr0416

1  Summary Chart, noting the November 13, 2007 conviction on its rap

2  sheet, and revising the guidelines calculations on its chart.

3      The amended chart included a +4 adjustment under §

4  2L1.2(b)(1)(D), yielding an adjusted offense level of 12, and included

5  5 criminal history points, for a category of III, and a range of 10

6  to 16 months.  The amended chart, however, retained the original

7  recommendation of 60 days.

8      Defendant objected to the filing of the amended chart, arguing

9  that the government was recommending a higher level, in breach of the

10  plea agreement.  The court overruled the objection, finding that the

11  government had not changed its recommendation and was therefore not

12  in breach.  The court noted that government counsel has an ethical

13  obligation, not subject to contractual waiver, to apprise the court

14  of whatever information it has about a defendant's criminal history,

15  and to provide the court with an accurate guidelines calculation.

16      Defendant objected that the government had not provided

17  documentation of a deportation following the newly-discovered illegal

18  reentry conviction.  The government acknowledged that it had not yet

19  provided that documentation to the court, because it had not yet

20  received it.  The court then asked defense counsel about Esparza's

21  immigration history:

> [The Court:] I don't know because I don't have a full
> probation report, but I am assuming that there is a
> deportation history anyway that lead to this first
> charging this fellow.
> [Defense Counsel]: That is the August 20th deportation.
> The Court: Not more than that? He hasn't been caught a
> bunch of times?
> [Defense Counsel]: I believe there are a number of
> returns.
> The Court:  So the point is, Mr. Esparza can't come back
> into the United States.  The Border Patrol has told him
> that and two judges have now told him that.

1    The court found that the four-level adjustment was appropriate.
2    The court then found that the correct offense level was 12, and the
3    correct category was III.    The court sentenced Esparza to five years
4    of probation, with an initial term of imprisonment of nine months.
5    Defense counsel did not object to the imposition of custody as a
6    condition of probation.    Defense counsel did object to the length of
7    the five-year term, arguing that two years was the applicable maximum.

8    Defendant timely appealed, alleging that the sentence imposed was
9    illegal, that the government had breached its plea agreement, and that
10   the court had erred in imposing that 4-level upward adjustment for
11   deportation following a felony conviction.

12   On June 27, the government filed a Motion for Summary Reversal,
13   arguing that the sentence imposed violated United States v. Forbes,
14   and that in light of the necessity for vacating the sentence and
15   remanding for resentencing, Defendant's other two claims were moot
16   because they derived from the sentencing hearing.    Defendant filed a
17   Response, stating that he did not oppose the motion "for the reasons
18   given by the government."

19   On July 24, 2008, the Ninth Circuit granted the motion for
20   summary reversal.    On July 28, the parties appeared for the spreading
21   of the mandate.    Defendant requested that the Court recuse itself on
22   the grounds of breach of the plea agreement that had tainted the
23   Court's judgment.    The government informed the Court that as of that
24   date (July 28), it still did not have the original I-205 Warrant of
25   Removal establishing Defendant's January 20, 2008 deportation, on
26   foot, to Mexico, through the Tecate Port of Entry, and therefore could
27   not, on that date, recommend the 4-level upward adjustment.

28   The Court requested briefing on the issue of whether Defendant

4

1  was entitled to immediate recusal, and briefing under seal on the

2  substantive allegations of breach.

3

4      Summary of Argument

5      There are four fundamental reasons why this Court should not find

6  that there was a plea agreement as defendant alleges.  First, there

7  is no memorialization of the agreement anywhere, whether in writing

8  or on the record in a court proceeding.  Second, there is no proof-

9  indeed, not even any suggestion- that Defendant himself was ever

10  presented with the alleged agreement, had its terms explained to him,

11  and agreed to it.  Third, defense counsel's own notes and actions

12  undermine his claim that there was an agreement: despite an initial

13  proposal by the government to negotiate an agreement under the

14  provisions of Fed. R. App. Proc. 42, despite his own acknowledgement

15  of the importance of creating a "paper trail," and despite having

16  ample opportunity to so, defense counsel never memorialized the terms

17  of the agreement in any communication with the government, and,

18  indeed, made no mention of it in his communications with the

19  government about the precise action he now says was consideration for

20  the agreement.  Fourth, defense counsel filed a Response to the

21  government's Motion for Summary Reversal- an action which he now

22  claims was the consideration for the alleged agreement, and which he

23  claims he took only because of that alleged agreement.  But in that

24  Response, he does not mention any agreement, despite attaching a

25  declaration explicitly stating his reasons for filing the Response.

26      "What the parties agreed to is a question of fact determined by

27  objective standards.  Accordingly, the district court's findings as

28  to the terms of a plea agreement are reviewed only for clear error."

<u>United States v. Sharp</u>, 941 F.2d 811 (9th Cir. 1991) (internal quotes omitted).

In the alternative, the agreement as alleged by Defendant would be void for lack of consideration.

<u>Argument</u>

1.    The Terms of the Alleged Agreement Were Never Reduced to <u>Writing or Recited on the Record in Court.</u>

Defendant has identified no authority supporting his claim that a binding plea agreement should be found on the facts of this case. An oral plea agreement is enforceable where the terms of the agreement are restated in a hearing and neither party disputes the description of the plea agreement at that time.  <u>See United States v. Sharp</u>, 941 F.2d 811, 816 (9th Cir. 1991). But neither of those conditions apply here. The government disputes the existence of an agreement, and the terms of the alleged agreement have never been explicitly recited in any forum, much less on the record in court.   The government has reviewed all cases appearing in the ALLFEDS Westlaw database including the phrase "oral plea agreement," and in every case in which the court found that an oral agreement existed, the terms were recited by the parties on the record in open court.   The government's research has revealed no case even approaching the facts alleged here, in which the existence of the agreement is disputed, and the terms were never stated on the record or reduced to writing in any form.   Nor has Defendant cited such a case.

In this case, Defendant asks this Court to find that an agreement existed based on defense counsel's notes and recollections of phone conversations with government counsel, and statements from defense counsel's supervisors about what he told them.  Government counsel has

6

no personal knowledge of what defense counsel said to his supervisors, or of what defense counsel wrote in his notes.  Government counsel has attached his own declaration regarding the communications in this case.

The government addresses below the plausibility of Defendant's account, and argues that Defendant's own evidence is at odds with the claim he now makes about the existence of an agreement.  Here the government notes that the evidence Defendant proffers is apparently without precedent as a basis for a finding that a plea agreement existed.  Indeed, in the cases Defendant cites, the plea agreement at issue was a standard written plea agreement.

> 2.    There is no Evidence that Defendant Himself Was Ever Informed of the Alleged Agreement, Had it Explained to Him, or Agreed to it.

Defense counsel has adduced no proof that his client was informed of the terms of the alleged agreement and agreed to them. If the agreement really was an agreement to abandon claims, as counsel characterizes it, then the client's approval would have been needed. But the client could not have been fully informed of all terms, because even on defense counsel's theory, those terms were never specified and nothing was in writing.   Peterson makes no representation that he ever discussed the agreement with his client, presented him with any sort of document memorializing the agreement, or had the client sign any such document.   The Seventh Circuit recently declined on similar facts to find that an oral agreement existed, <u>Coleman v. United States</u>, 318 F.3d 754, 759 (7th Cir. 2003) (declining to find that an oral plea agreement existed where defendant rejected the government's initial offer, then subsequently attempted

08cr0416

1    to enforce a portion of that offer as part of an alleged subsequent

2    agreement). Judge Rovner, concurring, drew special attention to the

3    lack of evidence that the client himself had been presented with the

4    terms of the alleged subsequent agreement and had assented to them.

5    Id. at 763. She cited Boykin v. Alabama, 395 U.S. 238, 243 (1969)

6    (holding that a plea is not valid absent evidence that the defendant

7    understood it and entered it voluntarily), the rule of which is

8    equally applicable here: "We cannot presume a waiver of these   . . .

9    important federal rights from a silent record."   Id.   Yet in his

10   papers, counsel does not claim to have presented his client with the

11   terms of the alleged agreement, and does not explain what terms, if

12   any, his client assented to.

13       This silence is particularly relevant to Defendant's claim that

14   his decision not to object to the government's motion for summary

15   reversal should count as detrimental reliance. While an attorney may

16   wish to pursue litigation because a claim is novel, interesting,

17   strong, etc., the relevant question is not whether the attorney

18   suffered a detriment, but whether the client did. The Defendant got

19   his nine-month sentence vacated after six months. He has no

20   possibility of release into the United States because he has a

21   supervised release violation sentence to serve on another conviction,

22   and then he will be deported to Mexico. However much his attorney and

23   his supervisors would like to have litigated the breach issue further,

24   see Exhibits A-D, doing so would have guaranteed that the defendant

25   himself served his full nine-month sentence before returning for

26   resentencing, at which point the government would have the right-

27   under the original plea agreement- of withdrawing and indicting

28   Defendant, who would then face a (correct) guidelines range of 10-16

1    months.

2        Mason set forth the above scenario in his first conversation with

3    Peterson.    Furthermore, Peterson repeatedly told Mason that his

4    client's interest was in getting the case returned quickly for

5    resentencing.

6

7

8        3.    Defense Counsel's Actions Are Not Consistent with his
             Allegation that There Was an Agreement.

9

10       The government agrees with defense counsel's narrative in most

11   respects.    Mason called Peterson and proposed negotiating a

12   settlement.    Specifically, Mason proposed that the parties should

13   reach an agreement, memorialize that agreement, and that Defendant

14   should then file a Rule 42 Motion to Voluntarily Dismiss.    Mason

15   proposed several possibilities for such an agreement, including, as

16   defense counsel noted, § 1001, § 1325, or adherence to the original

17   agreement, with a revised Sentencing Summary Chart reflecting the fact

18   that, as Mason informed Peterson, while DHS's computer databases

19   indicated that Defendant had been deported in January 2008, the U.S.

20   Attorney's Office was not in possession of the original I-205 Warrant

21   of Removal it needed to prove that deportation.    Mason told Peterson

22   that without that document, the government could not support the plus-

23   four adjustment it had alleged at the initial sentencing.    However,

24   once that document arrived, Mason could not ethically recommend to the

25   court the offense level specified in the agreement, and therefore

26   would have to withdraw per the agreement.

27       Defense counsel's notes reflect that Mason offered to enter an

28   agreement in which Defendant filed a Rule 42 Motion for Voluntary
     Dismissal.    Counsel's notes from 6/4/08, 6/5/08, and 6/17/08 indicate

08cr0416

that Mason proposed reaching a settlement, and told Peterson that the
government would fully litigate the breach issue otherwise.  Counsel's
6/17/08 notes reflect Mason's § 1001 proposal: the "six months range"
is reached by a base offense level of 6, an upward adjustment of 4 for
violation of a prior deportation order, and a downward adjustment of
2 for acceptance of responsibility.  That yields a level 8, which in
Category III (Defendant's category), results in a 6-12 month range.
(An illegal entry or re-entry count would yield an offense level of
either 10 (10-16 months) or 6 (2-8 months)).  The first mention of a
possible 1325 disposition in counsel's notes comes on 6/18.  Counsel's
notes make it clear that the offer was not accepted, and that counsel
wanted to talk to his supervisors before making any decision.
Specifically, counsel wanted to assess the possible impact of a piece
of information that according to his notes he had withheld from Mason:
his belief that his client had been incorrectly advised of the
statutory maximum.

The notes then show that on 6/23 Mason again proposed that
Defendant file a Rule 42 Voluntary Dismissal.  Peterson again rejected
that proposal.  Then, on 6/26, the notes say:

> tc from mason, review his st[anding?] offer- we dismiss
> case, second offer: they submit mtn for summary reversal
> and remand for resentencing.  then they will move tos et
> aside gp, we will move to   w/draw, then will get 1325
> misdo and stat cap burns at 6 mos.
> Write letter explaining this to mason (for paper trail).

Def. Exbt. E.

These notes do not establish that Mason made a "second offer"
that Peterson accepted.  Indeed, they undermine that claim.  A more
plausible reading of the notes is that the "second offer" was a
counter-offer from Peterson.

First, if the offer described in the notes had been made by

1   Mason, then "explain" is an odd verb to use to describe a "paper
2   trail" letter from Peterson to Mason.  A letter "explaining" the terms
3   of an agreement- which is what Peterson stated he intended to write-
4   could only logically be sent to a party that was not already aware of
5   the terms of the agreement.  The standard legal term for a letter
6   setting out the terms of an agreement already entered into is
7   "memorialize."  "Explain" makes more sense if the proposal is in fact
8   a counter-offer.

9        Second, Peterson <u>did</u> write the referenced letter to Mason, dated
10  the same day, 6/26/08, and that letter makes <u>no mention</u> of a 1325
11  disposition.  It references (and includes a copy of) a government
12  Motion for Summary Reversal, and states that the parties have agreed
13  that the government will concede error on the sentencing issue, and
14  recommend remand for resentencing.  The letter continues that on
15  resentencing, the government would withdraw as is its right under
16  Paragraph 8 of the Plea Agreement.

17       Peterson's notes indicate that his intention was to write a
18  letter to Mason setting out the terms of the parties' agreement as he,
19  Peterson, saw them.  The best- indeed, the conclusive- evidence of
20  Peterson's understanding as of June 26, 2008 is therefore that letter.
21  Peterson drafted the letter, and did so, according to his own notes,
22  with the intention of "explaining" to Mason his understanding of their
23  agreement.  Mason received the letter and was on notice of its
24  contents.  And when Peterson called Mason no July 24 and asserted the
25  existence of an agreement, Peterson specifically referenced that
26  letter as the memorialization of the agreement.  Yet Peterson now
27  moves this Court to disregard his own letter and enforce another
28  alleged agreement that is not memorialized anywhere.  That motion

08cr0416

1   should be denied.[1/]

2       If there was any further agreement to enter into a 1325 plea

3   bargain, there is no evidence of it. Defense counsel never reduced

4   that alleged additional agreement to writing, and never insisted, or

5   even proposed, that the government do so.  If he believed that there

6   was an enforceable agreement, why would he not seek to get it in

7   writing?  Doing so would (a) ensure that there was a meeting of the

8   minds, (b) preserve for future litigation the terms of the agreement,

9   and (c) allow Peterson to fully advise his client about the terms of

10  the agreement.    Peterson's own notes show that he recognized the

11  importance of writing a letter to Mason to create a paper trail.   Yet

12  the letter he wrote after making that note, and to which Mason

13  responded, makes no mention whatsoever of a 1325 charge.      It

14  references only an example of a government motion for summary

15  reversal- which the government filed- and withdrawal from the plea

16  agreement upon remand- which the government remains willing to do, and

17  which the government had the absolute right to do in any event under

18  the original agreement.[2/]

19  _____

20      [1/]The United States does not contest that Peterson's letter and
    Mason's response would constitute a binding agreement on the part of
21  the government to withdraw from the original plea agreement at
    resentencing, if there was consideration.  But Defendant alleges much
22  more: he alleges that the "real" agreement, though not mentioned in
    those documents, also included a 1325 charge bargain. That allegation
23  should be rejected. See United States v. Clark, 218 F.3d 1092, 1095
    (9th Cir. 2000) ("If the terms of the plea agreement on their face
24  have a clear and unambiguous meaning, then this court will not look
    to extrinsic evidence to determine their meaning.").
25      Furthermore, the United States has not, at this point, breached
    that agreement to withdraw.  The United States remains prepared to do
26  so at resentencing.  The only repudiation the United States has made
    is of an alleged agreement the existence of which the United States
27  contests.

28      [2/]For   that   reason,   the   instant   Motion   to   Compel   Specific
                                                            (continued...)

08cr0416

1    Mason's response was accurate: Mason drafted such a motion and
2   sent it to defense counsel to review; the motion was for summary
3   reversal, "exactly as you ask in your letter."   Peterson's letter
4   makes no reference to a 1325 plea; neither it nor the government's
5   response provides any evidence whatsoever of an agreement to enter
6   into a 1325 agreement.

7    The dispositive question, therefore, is why, if the June 26
8   letter was intended, according to defense counsel's notes, to be a
9   paper trail of the agreement, it made no mention of a 1325 charge,
10  which counsel now asserts was the heart of the agreement?   The only
11  substantive reference in the letter is to a motion by the government
12  for summary reversal, as being "the proper way to address the error
13  in appeal that you are conceding."  Mason's email response, likewise,
14  indicated that the government would file such a motion, and the
15  government did so.  At no time in any written communication did either
16  Peterson or Mason make any reference to an agreement to charge 1325.

17   According to Mason's recollection of the relevant conversations,
18  the parties discussed a potential 1325 resolution, along with a
19  potential 1001 resolution or the original 1326 resolution, in the
20  context of the government's proposal for a Rule 42 agreement and
21  Motion.   Mason proposed that the parties reach an agreement,
22  memorialize that agreement, and that Defendant voluntarily dismiss the
23  appeal pursuant to that agreement under the terms of Rule 42.
24  Defendant's notes for 6/17/08 accurately reflect that Mason proposed
25  to "withdraw, start from sq. 1, negot new agreement." Def. Exhibit E.

26

27        [2]/(...continued)
          Performance should be construed as a Motion to Compel the Government
28  to Move to Set Aside the Plea and Withdraw; or, what amounts to the
    same thing, a Motion to Set Aside the Plea.

08cr0416

1  Defendant, however, rejected that proposal, and no new agreement was

2  ever negotiated.    Defense counsel now states that he believed that

3  there was nonetheless a free-standing offer to enter into a 1325

4  agreement, irrespective of his rejection of the government's Rule 42

5  proposal. That belief was incorrect.    As the Seventh Circuit has held

6  on similar facts:

> [O]nce Coleman rejected the offer in the August 11, 1997
> letter, the parties went back to the drawing board.
> Coleman cannot now retrieve any contemplated plea
> agreements to prove that the government maintained a
> certain tactical position throughout the negotiations.

Coleman v. United States, 318 F.3d 754,759 (7th Cir. 2003).

Defendant could have guaranteed that the putative agreement would
be binding by doing what the government suggested initially: reaching
an agreement, and then filing a motion for voluntary dismissal by
agreement of the parties under Fed. R. App. Proc. 42.    Peterson does
not contest that the government initially proposed such a resolution,
and that he, Peterson, rejected it.    Yet if in fact there was an
agreement to withdraw the 1326 plea, dismiss the 1326 charge, and
plead to 1325, then a Rule 42 motion setting out those terms would
have guaranteed that result for Defendant!    The fact that Defendant
rejected that proposal, even after the government allegedly made the
1325 offer, undermines his claim that such an offer was actually made:
if it had been, Defendant could have locked it in.    But instead he
made no reference to it in his written communications with the
government, and made no reference to it in his response to the
government's motion.

In short, given the opportunity to present the terms of the
agreement to the court (the Ninth Circuit) before which the agreement
was allegedly made, Defendant said nothing whatsoever about it.    He

14

08cr0416

gives no explanation for that silence, or for his inexplicable failure

to take advantage of the procedure- explicitly provided in the Rules

of Appellate Procedure, and actually suggested by the government- for

memorializing an agreement in the Court of Appeals. How can that

silence be explained?  As the Fifth Circuit has commented on similar

facts:

> The time to assert the alleged oral plea agreement was
> before Judge Hudspeth. Silva failed to do so. . . . Silva
> had the opportunity to assert his version of the agreement
> before he pled guilty and before he was sentenced in the
> Western District. His failure to do so provides additional
> support to the trial court's determination that no such
> promise existed.

United States v. Williams,  809 F.2d 1072, 1080 (5th Cir. 1987).

Just so here: Defendant claims that there was a plea agreement

entered into during and pursuant to proceedings in the Ninth Circuit,

and that the consideration he furnished under that agreement was his

motion filed in the Ninth Circuit.  Yet he made no attempt to inform

the Ninth Circuit of the existence of the alleged agreement, despite

the availability of Rule 42, which exists for precisely that purpose.

And he knew of the availability of a Rule 42 motion because the

government's initial proposal, which Peterson rejected, was for the

parties to reach an agreement, and Defendant to make a Rule 42 motion

based on that agreement.

Peterson, in short, told his supervisors that he had an

agreement; however, when he filed a declaration in the Ninth

Circuit-the court that had jurisdiction over the matter and could

enforce the agreement- he did not mention it.  And when he wrote a

letter to the government-explicitly stating what he understood to be

the terms of his agreement- he did not mention it.  Indeed, he appears

to have refrained from mentioning the alleged 1325 agreement in any

15

1  written communication at all, until the filing of the instant Motion.

2  Why?  It is difficult to find an explanation for Peterson's actions

3  consistent with his allegation of the existence of such an agreement.

4

5        4.  Defense Counsel Filed a Declaration in the Ninth Circuit

6            Explicitly Stating his Reasons for not Opposing the Government's Motion, in which he Makes no Mention of an

7            Agreement.

8      In defense counsel's Declaration, filed in the Ninth Circuit

9  attached to his Response to the government's Motion for Summary

10 Reversal, he makes no reference to any agreement between the parties.

11 Nothing in Defendant's response indicates that it is in consideration

12 of a government agreement to charge 1325.  It would have been easy to

13 insert such language; Defendant could have stated, for example, "I do

14 not oppose this motion because on remand the government has agreed to

15 enter into a 1325 plea agreement."  Why, if there was such an

16 agreement, would Defendant not have mentioned it then?  Indeed, as

17 Defendant's own notes show, the government's initial proposal was

18 precisely to reach an agreement, and for Defendant to file a Rule 42

19 motion for voluntary dismissal "by agreement of the parties."  But as

20 Defendant's notes show, Defendant rejected that proposal.  The

21 agreement allegedly pertained to proceedings before the Ninth Circuit,

22 which had jurisdiction over the case.  Yet in his filing with the

23 Ninth Circuit, Defendant never mentioned the agreement.

24

25     5.  The Alleged Agreement Would Be Void in any Event for Lack of

26       Consideration.

27     Even assuming- which the government does not concede- that

28 Peterson's recollection of the phone conversations is accurate with

respect to Mason explicitly stating that on remand, the government

08cr0416

1  would move to withdraw from the agreement, dismiss the 1326 charge,

2  and charge Defendant with 1325, such a statement would not be an

3  enforceable contract, because there was no consideration, no meeting

4  of the minds with respect to the terms of the agreement, and no

5  acceptance by the client.

6      The Ninth Circuit has held that, unless there is detrimental

7  reliance, plea agreements are not binding until accepted by the court

8  hearing the case:

> We hold that neither the defendant nor the government is
> bound by a plea agreement until it is approved by the
> court. We agree with the Fifth Circuit's reasoning that,
> the realization of whatever expectations the prosecutor
> and defendant have as a result of their bargain depends
> entirely on the approval of the trial court. Surely
> neither party contemplates any benefit from the agreement
> unless and until the trial judge approves the bargain and
> accepts the guilty plea. Neither party is justified in
> relying substantially on the bargain until the trial court
> approves it. We are therefore reluctant to bind them to
> the agreement until that time. As a general rule, then, we
> think that either party should be entitled to modify its
> position and even withdraw its consent to the bargain
> until the plea is tendered and the bargain as it then
> exists is accepted by the court.

United States v. Savage, 978 F.2d 1136, 1138 (9th Cir. 1992).

    It is undisputed that the alleged agreement in this case was

never presented to a court for acceptance.  There is, however, an

exception to this rule where the defendant detrimentally relied on the

government's promise.

> The general rule, however, is subject to a detrimental
> reliance exception. Even if the agreement has not been
> finalized by the court, "[a] defendant's detrimental
> reliance on a prosecutorial promise in plea bargaining
> could make a plea agreement binding."

Id.

    In the Savage case, the court found no detrimental reliance

because the defendant

> did not plead guilty based on the agreement and he did not

17

1    provide any information or other benefit to the government
2    based on the agreement. Therefore, the district court did
     not err in refusing to compel the Government to perform
     the plea agreement.
3    Id.

4

5            a. There Was No Detrimental Reliance.

6        Defendant claims his response to the government's motion was

7    detrimental reliance. It was not, for four principal reasons. First,

8    Defendant did not- contrary to his characterization in his pleadings-

9    agree to the dismissal of his claims. Second, if Defendant had

10   opposed the government's motion, he would have guaranteed that he

11   would serve the full nine months before getting a ruling from the

12   Court of Appeals. Third, when he got that ruling, he would very

13   likely have been put back in the exact same position he is in after

14   summary reversal. And fourth, defense counsel repeatedly told counsel

15   for the government that his client's primary interest was in getting

16   a quick remand. That was the reason he requested expedited

17   proceedings in the first place.

18            1) There Was No Voluntary Dismissal.

19       The government contests Defendant's characterization of the

20   proceedings before the Ninth Circuit. Defendant did not agree to

21   "dismissal" of his appeal. Defendant expressly rejected the

22   government's proposal that he move for "voluntary dismissal." The

23   government did not move for dismissal and Defendant did not acquiesce

24   in dismissal. The government moved instead for Summary Reversal,

25   conceding error on the sentencing issue, and arguing that in light of

26   the need for resentencing, the other claims were moot. There was no

27   suggestion that Defendant was acquiescing in the abandonment of

28   actionable claims, and Defendant made no such suggestion in his

1  response or declaration.

2      To the contrary, Defendant expressly adopted the government's
3  reasoning in his response, stating that he did not oppose the motion
4  "for the reasons given by the government."  If his response was in
5  fact consideration for an agreement, the declaration would have been
6  the place to say so, inasmuch as it expressly purported to state
7  Defendant's reasons for his motion.  But Defendant said nothing about
8  it.

9      Defendant did not give up any legal rights by not opposing the
10 motion.   The parties agreed that Defendant's first issue required
11 remand.   Given that fact, Defendant's second and third claims were
12 necessarily mooted because they pertained only to the initial
13 sentencing hearing.  Those claims, regarding breach and Guidelines
14 calculations,   are   preserved   if   they   recur   on   resentencing.
15 Defendant's argument that he could have secured a remedy of remand to
16 a different judge is unpersuasive.  His breach claim simply would not
17 have been decided in the initial litigation, because it was an issue
18 that the court need not, and could not, reach.

19      Nor has Defendant lost the potential remedy of resentencing
20 before a different judge in the event of breach, because defense
21 counsel has now alleged breach a second time and has initiated
22 litigation on that second alleged breach.  As part of that litigation,
23 he has also re-opened the first claim of breach, and asks this Court
24 to rule on it again.  He remains free to litigate that claim further
25 and secure whatever remedy he can.  Nor would Defendant himself have
26 received any benefit from defense counsel's opposing the government's
27 motion; his nine-month term would have run before any ruling from the
28 Ninth Circuit, and he would have been returned to Judge Benitez to

19

face a supervised release violation allegation from his prior 1326 conviction, after which he would have been deported. That scenario will play out in the instant case as well, regardless of the outcome of this litigation. The only putative benefit to the client would be a new sentence that lessens the time on probation or supervised release, and therefore reduces the potential future penalties should he re-enter the country illegally after deportation. It is unclear whether as a matter of contract law, the courts of the United States should recognize the loss of such a potential benefit as detrimental reliance. The United States argues that on policy grounds, the courts should not. However, that debate is immaterial where the defendant has not in fact lost that potential benefit. And Defendant has not, as the instant litigation proves. He remains as free to argue breach now as he was at the initial sentencing. Indeed, in one respect he is clearly better off: the breach claim from the initial sentencing was moot, as the government argued and as Defendant conceded in his Response.

The mootness of those claims was not a question that was, or could be, subject to bargaining; it is a legal question, and the claims were moot. Defendant was in no way prejudiced; indeed, had the case gone through full briefing and argument, he would only have guaranteed that he served the full nine months, before getting, in all likelihood, exactly the same result. The only chance Defendant had of serving less than the nine-month term was summary reversal. Thus the government's motion conveyed a benefit, not a detriment, to Defendant. His sentence was vacated in six months– rather than 12 or 18 months– and he is not prejudiced by being now unable to litigate his guidelines and breach claims from the original sentencing, because

1  he would have been unable to litigate them in any event.  If either

2  of those claims arises from resentencing, he remains perfectly free

3  to litigate them.

4      Defendant's claim at Page 2 of his motion that those issues "are

5  no longer moot" misunderstands the concept of mootness: his claims

6  with respect to the previous sentencing hearing– the claims relevant

7  to the detrimental reliance issue– are absolutely and unequivocally

8  moot, because that judgment has been vacated.  If such claims were to

9  arise in a subsequent sentencing hearing, those claims can be

10 litigated.  But no subsequent proceedings can "un-moot" the claims

11 deriving from the initial sentencing hearing.

12              2)    Opposing the Government's Motion Would Not Have

13                    Benefitted Defendant.

14     Peterson claims that but for the government's promise to charge

15 his client with a misdemeanor on remand, he would have opposed the

16 government's motion for summary reversal.  He states that he and his

17 supervisors thought that his breach claim was strong.  Be that as it

18 may, it is undisputed that by opposing summary reversal Peterson would

19 have guaranteed that his client served the full sentence before a

20 Ninth Circuit ruling; summary reversal was the only possibility for

21 achieving prompt resentencing.  Peterson makes no argument that the

22 Ninth Circuit would not have granted the motion in any event, or that

23 if the case had been fully litigated, he would not have ended up in

24 the same position– remand on the sentencing issue with no ruling on

25 the other claims– but after 12 or 18 months rather than six.

26              3)    The Government Could Have, and Would Have, Filed

27                    Its Motion Without the Consent of Defendant.

28     The government did not need Defendant's agreement to file its

                                  21

1 motion.   Furthermore, the reasons for the motion, as stated in both
2 the government's and Defendant's attached declarations, make no
3 mention of any agreement.   Nor was the avoidance of litigation a
4 benefit to the government: the government had not opposed Defendant's
5 motion for an expedited schedule, and therefore had already prepared
6 its brief, which was to have been filed the same day the Motion for
7 Summary Reversal was filed.

8         4)   <u>Defense Counsel Repeatedly Indicated That His</u>
9                <u>Client Wanted to Get a Quick Remand.</u>

10     Defense counsel's first act in this appeal was to request an
11 expedited schedule.   Peterson called Mason after filing his notice of
12 appeal and asked whether Mason would oppose his request to expedite
13 the appeal.   He explained that his primary goal was to get the case
14 remanded as quickly as possible.   He stated that he did not want his
15 client to serve out the full nine months before getting a ruling from
16 the Ninth Circuit.

17     Now, however, Defendant argues that he suffered a detriment by
18 not litigating his breach claim and his guidelines claim.   That claim
19 is contradicted by his efforts to expedite the appeal and by his
20 explanation to Mason of why he was attempting to expedite the appeal.
21 Mason told Peterson in their first conversation that the government
22 would litigate the breach claim, so if Peterson persisted in it, the
23 case would necessarily go through full briefing and- both Mason and
24 Peterson agreed- likely oral argument.   Peterson cannot now have his
25 cake and eat it too: on the one hand, he pursued an expedited appeal
26 because he was looking for a quick remand before the nine-month
27 sentence was up.   But on the other hand, getting that remand was a
28 detriment to him, he now claims, because he did not get to litigate

08cr0416

1    his breach claim through to oral argument.

2        Peterson never mentions in his pleadings his efforts to expedite
3    the case, and his call to Mason explaining why he wanted the case
4    expedited.

5                    5) <u>Conclusion</u>

6        In sum, the government did not receive any benefit by this
7    alleged agreement, and the defendant did not incur any detriment.
8    Even if defense counsel's recollection is accurate- which the
9    government does not concede- that Mason made a promise to withdraw,
10   dismiss, and charge 1325, and that he made this promise after
11   Defendant had rejected his Rule 42 offer, and entirely independently
12   of that Rule 42 offer, such a statement does not create an agreement
13   where there is no detrimental reliance or other consideration.[3/]

14               <u>Conclusion</u>

15       The position of the United States was and remains that it is
16   willing either to withdraw from the plea agreement and re-negotiate,
17   or to maintain its recommendation of 60 days.  Mason consistently
18   conveyed to Peterson the government's willingness to either (a) adhere
19   to its initial recommendation, or (b) withdraw and renegotiate.  Mason
20   consistently conveyed to Peterson that there would be several possible
21   options for renegotiation, including, as reflected in Peterson's

_____

23   [3/]Plea agreements are typically strictly construed against the
     government, for two reasons: first, they are interpreted according to
24   principles of contract law, and thus are strictly construed against
     the drafting party- which is almost always the government.  Second,
25   the defendant, in a typical plea agreement, agrees to give up
     fundamental rights.  But in this case neither of those rationales
26   applies: first, the government did not draft a plea agreement, and on
     Defendant's theory of the case, the terms were proposed by Defendant,
27   after Defendant had rejected the government's proposal.  Second,
     Defendant did not give anything up; he got a victory in his appeal,
28   and the mooted claims remain available to him if they recur on
     resentencing.  It therefore does not follow that the agreement alleged
     by Defendant should be strictly construed against the government.

                                23                            08cr0416

notes, 1001 or 1325.  But these conversations did not create a binding contract because, first, Peterson expressly rejected the government's proposal, and told Mason he would not enter into any Rule 42 agreement; and second, the evidence casts doubt on Peterson's claim that there was an agreement, insofar as he never made any attempt to reduce the agreement to writing and have Mason- or his own client- sign a document specifying the terms, despite acknowledging in his notes the importance of creating a "paper trail."

Peterson had ample opportunity to memorialize the agreement he now claims exists: he could have insisted that the agreement be put in writing before filing his Response in the Ninth Circuit.  He could- at any time- have set down in writing, and presented to Mason for ratification, the terms as he understood them, thus creating the "paper trail" his notes say he intended to create.  But he never did so.  He never created that paper trail: he failed to mention the agreement in his June 26 letter; he never wrote out the agreement; he never insisted that the government provide him with an agreement; he never had his client sign a document specifying the terms.

Peterson's failure to take any of these steps calls into doubt the existence of an agreement.  Why, if there had been an oral agreement as Peterson alleges regarding a 1325 charge, and he knew the importance of creating a paper trail, did Peterson not do so?  Why, instead, in the letter he wrote <u>after</u> noting his own intent to create a paper trail, did he refer <u>only</u> to the government filing a motion for summary reversal- which the government in fact filed?  If Peterson believed that the government had entered into an agreement, and he wanted to secure the benefits of that agreement for his client, the obvious step would be to reduce the agreement to writing and have the

24

1  parties sign it.  But Peterson never did so, and never asked Mason to

2  do so.  It is undisputed that Mason never drafted any such agreement,

3  never signed one, and was never presented with one.  It is undisputed

4  that the written communications in evidence make no mention of a 1325

5  charge.  The only reference they make to government action is to a

6  motion for summary reversal as opposed to a defense motion for

7  voluntary dismissal.

8      There are a variety of reasons why contracts, including plea

9  agreements, are typically reduced to writing and signed by the

10 parties.  Among these are notice to all parties that there is a

11 binding agreement, and clear specification of terms for any subsequent

12 adjudication.  See United States v. Monreal, 301 F.3d 1127, 1133 (9th

13 Cir. 2002) (holding that oral plea agreements are "recipes for

14 uncertainty and misunderstanding" because they do not serve these

15 functions well).  Putting an agreement in writing- or stating it on

16 the record in open court- establishes the fact of its existence.  In

17 this case, the fact that Peterson did not do so- despite sending a

18 letter to the government that according to his own notes set forth his

19 understanding of their agreement- seriously undermines his present

20 claim that there was an agreement with the terms he alleges.

21     The evidence, in sum, is difficult to square with Peterson's

22 claim that there was an agreement as he now alleges between Defendant

23 and the government.

24     Because the evidence fails to show the existence of an agreement,

25 this Court should deny Defendant's motion.  Alternatively, because the

26 putative agreement asserted by Defendant lacks consideration or

27 evidence of acceptance by Defendant himself, this Court should deny

28 Defendant's motion.  The government remains willing to abide by the

08cr0416

1  original written plea agreement, or to withdraw from that agreement
2  and renegotiate the disposition.

3

4
   DATE: August 12, 2008              Respectfully submitted,
5
                                      KAREN P. HEWITT
6                                     United States Attorney
7
8                                     CALEB E. MASON
9                                     Assistant United States Attorney

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

08cr0416

UNITED STATES DISTRICT COURT

SOUTHERN DISTRICT OF CALIFORNIA

UNITED STATES OF AMERICA,           )    Case No. 08cr0416
                                    )
        Plaintiff,                  )
                                    )
    v.                              )
                                    )    **CERTIFICATE OF SERVICE**
FRANCISCO ESPARZA-GUTIERREZ,        )
                                    )
        Defendant.                  )

IT IS HEREBY CERTIFIED THAT:

   I, Caleb Mason, am a citizen of the United States and am at least eighteen years of age.  My business address is 880 Front Street, Room 6293, San Diego, California 92101-8893.
   I am not a party to the above-entitled action.  I have caused service of this Motion, dated August 12, 2008, and this Certificate of Service, dated August 12, 2008, on the following parties:

   **David Peterson, Esq.**

   **Federal Defenders of San Diego, Inc.**

   **225 Broadway, Suite 900**

   **San Diego, CA 92101**
   *Attorney for defendant*

   I declare under penalty of perjury that the foregoing is true and correct.

   Executed on August 12, 2008.

            /s/ Caleb E. Mason
            CALEB E. MASON
            Assistant United States Attorney

KAREN P. HEWITT
United States Attorney

08cr0416